# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
       Plaintiff,

  v.                                              Case No. 10-CR-128

**FRANCISCO RAMIREZ-MARTINEZ**
       Defendant.

## DECISION AND ORDER

Defendant Francisco Ramirez-Martinez, charged with possession of a firearm as an illegal alien and an unlawful drug user, moved to suppress physical evidence and statements obtained by law enforcement following an encounter at this home. The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, then issued a recommendation that the motion to be granted in part and denied in part. Specifically, the magistrate judge found that the police unlawfully entered defendant's home and seized him, leading to the discovery of marijuana, which the magistrate judge recommended be suppressed. However, the magistrate judge found that defendant's mother and girlfriend nevertheless voluntarily consented to a search of the home, leading to the discovery of the firearms. The magistrate judge also found defendant's post-arrest statements sufficiently attenuated from the illegal seizure to purge the primary taint.

The government has not objected to the recommended suppression of the marijuana, but defendant objects to the recommended denial regarding the firearms and his statements. I review de novo those portions of a recommendation to which specific objection has been made. See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1); United States v. O'Neill, 27 F. Supp.

2d 1121, 1126 (E.D. Wis. 1998).[1]  Neither side has requested a de novo hearing or specifically objected to the magistrate judge's recitation of the facts.  I therefore accept those factual findings, which I first summarize, before turning to the legal issues in dispute.

## I.  FACTS

On June 19, 2010, two suspects – believed to be members of the Mexican Posse street gang – robbed the Harmony Foods store in Milwaukee.  When a store employee gave chase, a third suspect outside fired a shot at the employee.  Witnesses to the robbery identified Tony Mora as one of the suspects.  (Aug. 23, 2010 Evid. Hr'g Tr. at 7-8, 20.)  Mora was arrested shortly thereafter, and on June 22, 2010, Milwaukee Police Department ("MPD") Detective Thomas Obregon interviewed him.  Mora admitted being involved in the robbery but denied being the shooter.  (Tr. at 9.)  Mora identified the second suspect as a male he knew as "Tequa" and the third as a Puerto Rican male he knew only as "Rico."[2]  (Tr. at 10, 29.)  Mora told Obregon that the gun used in the offense was a black revolver belonging to Tequa and offered to show Obregon where Tequa lived.  Obregon, accompanied by Officers Evelyn Lazo and Cory Smith, then took Mora to Tequa's neighborhood in an undercover car, and Mora identified Tequa's residence.  (Tr. at 10-11, 35, 53.)  Mora also identified a male sitting on the porch of the residence as "Cache," Tequa's brother.  Obregon knew Cache from a prior

---

[1]The government notes that defendant filed his objections one day late.  However, as the government also notes, the fourteen-day deadline for objections is not jurisdictional, and the government points to no prejudice based on this slight delay.  In the exercise of discretion, I will therefore consider the merits.  See Schur v. L.A. Weight Loss Centers, Inc., 577 F.3d 752, 760-61 (7th Cir. 2009); United States v. Brown, 79 F.3d 1499, 1504-05 (7th Cir. 1996).

[2]Obregon doubted Mora's identification of the third person, as he understood Mora to be a member of the Mexican Posse gang, which did not associate with Puerto Ricans.  However, Obregon made no further effort to identify Rico.  (Tr. at 10, 30.)

2

incident in which Cache was the victim of a robbery. (Tr. at 11-12.) We now know that "Cache" is defendant, and "Tequa" is his brother and co-defendant in this case, Jorge.

Obregon requested additional officers assist in checking the residence for suspects and a firearm. (Tr. at 13.) As the additional officers arrived at the scene, Mora observed Tequa in the backyard of a residence across the street. Obregon attempted to advise Lazo and the other officers of Tequa's location, but they had already proceeded to defendant's residence. (Tr. at 13-14.)

Officer Lazo, accompanied by Officer Jose Arzaga, proceeded to the backyard of the residence, where they encountered a woman, later identified as defendant's mother, standing on the back porch in front of an open door leading into the residence. Lazo asked defendant's mother if she lived at the house, while Arzaga proceeded up the ramp towards the back porch. (Tr. at 56-58, 70, 83, 85.) Defendant's mother called inside for defendant, using his nickname Cache. (Tr. at 59, 70, 86.) As Arzaga stood next to defendant's mother on the back porch, defendant appeared inside the residence, near the doorway. Defendant looked at Lazo, and Lazo requested that he come out to her. (Tr. at 59-60.) Defendant appeared nervous, put his hand into his pocket, and turned as if to retreat down the stairs into the basement of the residence. (Tr. at 61, 86.) Arzaga then stepped across the threshold of the doorway and into the residence with at least one foot and clasped his hand upon defendant's shoulder. (Tr. at 61, 110, 123.) As Arzaga did so, defendant reached his hand past Arzaga and toward his mother who was still standing outside the residence. Defendant handed her a piece of paper, stating, in Spanish, "Hey, Mom, it's a joint." (Tr. at 87.) With his hand on defendant's shoulder,

Arzaga directed defendant outside of the residence and towards the other officers.[3] He then passed defendant off to other officers, who had him sit in a chair in the yard while he spoke to defendant's mother. (Tr. at 89-90, 125.)

Arzaga asked for and received the piece of paper, suspected marijuana, from defendant's mother, handed it to Lazo, then spoke with defendant's mother regarding why the police were at the house.[4] (Tr. at 90.) He asked for permission to go inside to speak with her in the kitchen; she appeared very cooperative and agreed. (Tr. at 91-92.) Arzaga then asked if it would okay if the police searched the house for any drugs or guns, explaining that she had a right to refuse, but she readily agreed. Arzaga memorialized the consent in his memo book. (Tr. at 93-94.) He then searched the kitchen area, finding nothing of evidentiary value. (Tr. at 96.)

Another officer, Michael Hansen, arrived at the scene after Arzaga made contact with defendant at the back door. As Hansen exited his squad car in the alley behind the residence, he encountered a young woman named Stephanie. (Tr. at 132-33.) Stephanie asked Hansen what was going on, and Hansen responded that they were looking for a wanted subject. She stated that she lived at the residence with defendant, the father of her child. (Tr. at 133-34.) Hansen asked Stephanie if there were any drugs or guns in the house, and she said there were not. Hansen then asked if she minded if they stepped into the house, she complied, and they proceeded into the kitchen area, where Arzaga and defendant's mother were already

---

[3]Arzaga testified that he decided to detain defendant – even before defendant passed the suspected marijuana to his mother – because he was concerned that defendant may be returning to the house to access or hide the gun. (Tr. at 121.)

[4]At that point, Obregon was able to reach Lazo, asking her to come across the street to arrest Jorge, which she did. (Tr. at 14, 45-46, 64-66.)

4

conversing. (Tr. at 134-35.)

Hansen asked if Stephanie would show him the bedroom she and defendant shared, and she agreed. (Tr. at 135.) Hansen also asked Stephanie if she minded if he took a look around and searched the residence, and Stephanie stated she did not mind. Stephanie appeared calm and cooperative, and led Hansen into the basement. In the hallway outside of her basement bedroom, Hansen asked Stephanie to memorialize her consent in his memo book by signing and dating a written statement, which she did. (Tr. at 137-39.) Hansen subsequently searched the bedroom, locating two firearms and ammunition. (Tr. at 140-41.)

The following day, at about 11:00 a.m., Obregon interviewed defendant (who had been arrested for marijuana possession) at the Milwaukee Police Administration Building. (Tr. at 15.) As they walked to the interview room, defendant and Obregon engaged in small talk related to their prior contact when Obregon investigated a case where defendant was robbed. (Tr. at 15-16.) Defendant stated that he knew Obregon wanted to talk about the robbery at Harmony Foods, and he offered that he knew who did it. Obregon stated that he would have to advise defendant of his rights before they could talk about the robbery and proceeded to do so using a pre-printed English Miranda card, which Obregon translated into Spanish. (Tr. at 16-17.)

Obregon described the interview as relaxed without any threats, promises, or raised voices, and stated that defendant was very cooperative but upset that his brother had gotten him into this situation. (Tr. at 17, 19.) During the twenty-six minute interview, which was audio recorded but mostly in Spanish, Obregon and defendant discussed local gangs and the robbery at Harmony Foods. Defendant stated that he heard that his brother and Mora were involved in the robbery. (Tr. at 17-18.) When shown photographs of the firearms recovered from his residence, defendant admitted handling one of them but stated that he thought it was broken;

5

he denied knowledge of other gun, aside from stating that it was possible that his girlfriend could have touched it while cleaning the residence. (Tr. at 18-19.) Defendant also admitted that he came to the United States illegally, and a day or two after the interview Obregon notified Immigration and Customs Enforcement ("ICE") of this information. Obregon had developed a practice whereby if, during one of his investigations, he came across an individual who was in the country illegally he called ICE agent Russell Dykema. (Tr. at 48, 163.)

Based upon Obregon's information, Dykema issued an immigration detainer for defendant. (Tr. at 165.) As a result of this detainer, defendant was transferred to ICE custody for immigration processing on June 29. (Tr. at 166.) Dykema read defendant his Miranda rights, which he acknowledged by signing his initials after each right. (Tr. at 167-70.) Defendant then made inculpatory statements regarding one of the firearms and his use of marijuana. Defendant appeared calm and friendly throughout this interview, which lasted about thirty minutes and involved no threats, promises, or raised voices. (Tr. at 171-72.)

## II. DISCUSSION

The magistrate judge found that, at the time Arzaga stepped across the threshold and seized defendant, he lacked probable cause to suspect defendant of a crime; nor did exigent circumstances exist supporting the entry. (Recommendation at 10-15.) The magistrate judge further concluded that defendant passed the suspected marijuana to his mother in response to the unlawful entry and seizure and thus did not voluntarily abandon it. He therefore recommended that the marijuana be suppressed. (Recommendation at 15-16.) Neither side objects to these conclusions, which I will accept. Defendant does object regarding the magistrate judge's findings regarding his mother and girlfriend's consents to search and his post-arrest statements.

6

**A.    Consent to Search**

The magistrate judge concluded that defendant's mother and girlfriend voluntarily consented to the search, and that their consents were not tainted by Arzaga's unlawful entry and seizure.  While the Fourth Amendment generally demands a warrant before police may search a home, a voluntary consent "lifts" the warrant requirement.  United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996). Whether consent was voluntary is determined by considering the totality of the circumstances, including such factors as the consenting person's age, intelligence, and education; whether she was advised of her rights; how long she was detained before she gave consent; whether her consent was immediate or prompted by repeated requests by the authorities; whether any physical coercion was used; and whether the individual was in police custody when she gave her consent.  United States v. Alexander, 573 F.3d 465, 477 (7th Cir. 2009), cert. denied, 130 S. Ct. 1560 (2010).  The government bears the burden of proving, by a preponderance of the evidence, that consent was voluntarily given. United States v. McGraw, 571 F.3d 624, 628 (7th Cir. 2009).

However, where consent is obtained following an illegal entry, the government must also demonstrate that the consent was not tainted by the illegal entry.  Alexander, 573 F.3d at 477 (citing United States v. Robeles-Ortega, 348 F.3d 679, 683 (7th Cir. 2003)).  The government may make this showing by establishing that the consent was obtained by means sufficiently distinguishable from the illegal entry so as to be purged of the primary taint.  Relevant factors include the temporal proximity of the illegal entry and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.  Id.

I agree with the magistrate judge that the government met its burdens here.  First, while it is true that the officers obtained the consents of defendant's mother and girlfriend shortly

after the unlawful entry, the nature of that misconduct was minimal. This was not a case in which multiple officers broke down the door and entered with guns drawn. Cf. Robeles-Ortega, 348 F.3d at 680-81. Rather, Arzaga briefly and minimally entered the house and redirected defendant back outside. Further, neither defendant's mother or girlfriend were unlawfully seized; nor were they even present inside the house when Arzaga unlawfully entered it. Defendant's mother witnessed the encounter at close quarters, but as the magistrate judge noted, a reasonable layperson in her position may not have even understood that anything improper occurred. For her part, it is unclear whether Stephanie, who encountered Hansen in the backyard, observed Arzaga unlawfully enter the house and seize defendant.[5] Thus, it is hard to see how the unlawful entry and seizure may have tainted her later consent.

Second, the record amply demonstrates that the women consented voluntarily. The officers testified, without contradiction, that both women were cooperative and promptly consented when asked. Arzaga testified that he told defendant's mother she could refuse, yet she still agreed. While Hansen did not provide similar information to Stephanie, such advice is not required, see United States v. Grap, 403 F.3d 439, 443 (7th Cir. 2005), and Hansen, like Arzaga, obtained written confirmation of the verbal consent provided. Neither woman was detained or under arrest at the time, and the officers employed no coercive tactics.

In his objections, defendant argues that the officers never obtained consent to enter the home in the first place, and the women merely acquiesced in the officers' apparent display of lawful authority to be there. However, Arzaga testified that he asked defendant's mother for

---

[5]Hansen admitted that it was "fair to say" that Stephanie saw defendant escorted away by other officers. (Tr. at 147.) However, there is no direct evidence that she saw Arzaga pull defendant from the house. Further, defendant was not handcuffed at that time. (Tr. at 159.)

8

permission before entering the house, and she said, "yeah, go ahead; no problem." (Tr. 92.) It is true that on cross-examination Arzaga somewhat confusingly testified that he did not obtain permission to enter the house from anyone (Tr. at 118-19), but it appears that during this exchange he might have been speaking of written consent and/or the entry pursuant to which he seized defendant. There is no clear evidence that Arzaga entered the home without permission; rather, given his description of the encounter with defendant's mother, it is clear that she agreed by her actions if not by her direct words to allow Arzaga inside. For Stephanie's part, Hansen testified that he asked if they could step inside to talk, and she agreed. (Tr. at 134-35, 160.) He then asked her to show him the bedroom she shared with defendant, and she agreed to do that too. (Tr. at 135.) Thus, it is clear that all of Hansen's actions followed Stephanie's consent, and it was Hansen who found the guns at issue.[6]

Therefore, for these reasons and those stated by the magistrate judge, I find that the officers properly obtained consent, and that the motion to suppress the firearms must accordingly be denied.

**B.    Post-Arrest Statements**

The magistrate judge noted that the officers arrested defendant for marijuana possession, but because the seizure of the marijuana flowed from the illegal entry and seizure of defendant it could not serve as a basis for lawful detention. However, the magistrate judge concluded that, following the discovery of the two firearms in defendant's bedroom, one of which matched the description of the firearm used in the robbery provided by Mora, the officers

---

[6]Indeed, in its post-hearing brief before the magistrate judge, the government argued that only Stephanie's consent mattered. I tend to agree, but discuss both women's consents for the sake of completeness.

9

acquired probable cause to arrest defendant as a suspect in the robbery. The magistrate judge acknowledged that Mora identified the third suspect as "Rico," but Obregon testified that he doubted Mora told the truth in that regard. Therefore, following discovery of the firearms in defendant's bedroom, the officers could have objectively and reasonably concluded that the third suspect was defendant. The magistrate judge went on to conclude that defendant's two confessions were sufficiently attenuated from the illegal arrest and accordingly need not be suppressed. See United States v. Roche-Martinez, 467 F.3d 591, 593-94 (7th Cir. 2006) (holding that unlawful entry into the home of a criminal defendant does not require suppression of subsequent statements if probable cause existed to arrest the defendant) (citing New York v. Harris, 495 U.S. 14, 17-18 (1990)).

A confession following an illegal arrest must be excluded from evidence unless is it sufficiently attenuated to purge the primary taint. Brown v. Illinois, 422 U.S. 590, 602 (1975). The threshold requirement for admissibility is that the confession was voluntary; if so, the court then considers the temporal proximity of the illegal conduct to the statements, the presence of any intervening circumstances, and most importantly, the purpose and flagrancy of the police misconduct. United States v. Reed, 349 F.3d 457, 463 (7th Cir. 2003) (citing Brown, 422 U.S. at 603-04).

In the present case, it is clear that defendant's statements to Obregon and Dykema were voluntary; he received and waived Miranda warnings prior to both statements, and on both occasions he spoke freely, without threat, coercion, or promise. Defendant does not argue otherwise. Rather, he disputes attenuation, which requires me to consider the factors identified in Brown.

There is no bright-line test for temporal proximity; the Supreme Court has suppressed

10

statements made two and six hours after arrest, but found admissible a confession made only forty-five minutes after an illegal arrest. Reed, 349 F.3d at 464-64 (collecting cases). Accordingly, the Seventh Circuit has suggested that the court consider the temporal proximity factor in conjunction with the presence of intervening circumstances. Id. at 464. The type of intervening events that may serve to attenuate official misconduct include subsequent release from custody, arraignment before a magistrate judge, discussions with counsel, the discovery of other incriminating evidence implicating the defendant and causing the defendant to confess spontaneously, the defendant's self-transport from the scene of illegal arrest to another location, and proper arrest on unrelated charges following the initial illegal arrest. Id. (collecting cases).

In the present case, the police discovered other incriminating evidence, i.e., the firearms, following the unlawful arrest. Defendant does not in his objections dispute that discovery of one of the guns in his bedroom served to implicate him in the robbery. Rather, he argues that the court may not rely on that discovery because the officers found the guns pursuant to invalid consents. However, I have concluded that the officers obtained voluntary consent from defendant's mother and girlfriend. I thus find that the officers obtained incriminating evidence subsequent to the illegal arrest, which provided an independent basis to continue his detention.

Other factors also support attenuation here. Defendant's statement to Obregon occurred the day after his arrest; Obregon was not involved in the unlawful seizure; and there is no indication that Obregon sought to exploit the unlawful seizure. Rather, defendant appeared eager to speak to Obregon, volunteering to give a statement even before Obregon asked any questions. Obregon prevented defendant from speaking before providing Miranda warnings; after defendant waived his rights, Obregon conducted a brief, non-coercive

11

interrogation.

The statement to Dykema was even more attenuated; it came about a week later, following defendant's transfer from MPD custody to ICE custody. ICE had nothing whatever to do with the unlawful seizure and arrest. And, as with the first statement, ICE agents provided Miranda warnings and proceeded in a non-coercive manner. Cf. Holland v. McGinnis, 963 F.2d 1044, 1050-51 (7th Cir. 1992) (finding the defendant's second statement admissible, despite an earlier coerced statement, where the defendant was transferred from the site of the first statement to a different location; the officers who initially mistreated the defendant during the first statement were not present for the second, which followed renewed Miranda warnings; and about six hours passed between the two statements).

In his objections, defendant notes that he remained in custody and did not, between his arrest and the statements, appear in court or meet with counsel. However, he fails to acknowledge the intervening discovery of an alternate basis for his arrest or, regarding the statements to Dykema, the change in location and detaining authority.

Moreover, defendant says nothing in his objections about the final and most important factor in the Brown analysis – the purpose and flagrancy of the official misconduct. Courts have previously found a Fourth Amendment violation flagrant and purposeful where (1) the impropriety of the misconduct was obvious or the officer knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up. United States v. Carter, 573 F.3d 418, 425 (7th Cir. 2009). Where the police erred, but the record does not support an inference of bad faith, the violation will generally be deemed non-flagrant. Id. at 425-26. Consideration of these factors supports the government's position in this case.

First, as is evidenced by the magistrate judge's lengthy discussion regarding Arzaga's initial contact with defendant, the finding that Arzaga acted unlawfully was a close call. This was not a situation in which the police burst through the door and threw defendant to the ground. Rather, the intrusion into defendant's home was minor – Arzaga crossed the threshold with one foot, placed his hand on defendant's shoulder, and directed him back outside. Second, Arzaga was able to articulate sensible reasons for so detaining defendant, i.e., he was concerned that defendant, if permitted to return into the house, would access or hide the gun the officers were looking for. Third, there is no indication that the officers sought to exploit the arrest to improperly obtain defendant's statement. In other words, there is no indication that it served as an expedition for evidence undertaken in the hope that something might turn up. See Brown, 422 U.S. at 605. Finally, as discussed above, the interrogating officers acted in a non-coercive manner. While it is true that "'purposeful and flagrant' misconduct is not limited to situations where the police act in an outright threatening or coercive manner," Reed, 349 F.3d at 465, these are certainly relevant circumstances.

In sum, because the unlawful police intrusion was minor; the officers had "an arguable basis for the detention" at the time,[7] id., and the intervening discovery of the guns provided a new and objective basis for detention; and the statements came significantly later, I find sufficient attenuation and decline to suppress the statements.

---

[7]As the magistrate judge discussed, it is debatable that the officers had probable cause to arrest defendant for marijuana possession. The magistrate judge found that defendant's passing of the joint to his mother followed Arzaga's "seizure" of his shoulder, but barely. Had Arzaga seen the marijuana before he touched defendant, the result on this issue would likely have been different, and there would be no "primary taint" affecting either the consents or the statements.

13

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 35) is adopted, and defendant's motion to suppress (R. 19) is **GRANTED** in part and **DENIED** in part, as stated herein.

Dated at Milwaukee, Wisconsin, this 1st day of December, 2010.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge